U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

2022 MAY 20  PM 2: 52

CLERK

BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
v.                              )    Civil Action No. _5:22 - cv -109_
                                )
EDGE PHARMA LLC, a limited liability  )    **COMPLAINT FOR**
company, and WILLIAM MARC CHATOFF  )    **PERMANENT INJUNCTION**
and KURT RADKE, individuals,    )
                                )
            Defendants.         )

Plaintiff, the United States of America, by its undersigned attorneys, and on behalf of the

United States Food and Drug Administration ("FDA"), respectfully represents as follows:

1.      This statutory injunction is brought under the Federal Food, Drug, and Cosmetic

Act (the "Act"), 21 U.S.C. § 332(a), to permanently enjoin the defendants, Edge Pharma LLC

("Edge Pharma"), a limited liability company, and William Marc Chatoff and Kurt Radke,

individuals, (collectively, "Defendants") from: (a) violating 21 U.S.C. § 331(a) by introducing

or causing to be introduced, or delivering or causing to be delivered for introduction, into

interstate commerce articles of drug that are adulterated within the meaning of 21 U.S.C.

§§ 351(a)(2)(A) and 351(a)(2)(B), and/or that are misbranded within the meaning of 21 U.S.C.

§ 352(f)(1); (b) violating 21 U.S.C. § 331(k) by causing articles of drug to become adulterated

within the meaning of 21 U.S.C. §§ 351(a)(2)(A) and 351(a)(2)(B), and/or to become

misbranded within the meaning of 21 U.S.C. § 352(f)(1), while such drugs are held for sale after

shipment of one or more of their components in interstate commerce; and (c) violating 21 U.S.C.

§ 331(d) by introducing or causing to be introduced, or delivering or causing to be delivered for

introduction, into interstate commerce new drugs, as defined by 21 U.S.C. § 321(p), that are neither approved under 21 U.S.C. § 355 nor exempt from approval.

2.      Defendants have a history of manufacturing injectable drugs intended to be sterile under conditions that fall short of the minimum requirements to ensure sterility. Despite FDA's repeated attempts to obtain Defendants' voluntary compliance with the Act, Defendants continue to demonstrate that they are unwilling or unable to implement sustainable corrective actions to ensure the sterility of drugs intended to be sterile, and the safety and quality of all drugs they manufacture. The history of serious violations of the Act and the likelihood that violations will continue in the absence of court action demonstrate that injunctive relief is necessary.

**Jurisdiction and Venue**

3.      This Court has jurisdiction over the subject matter and all parties to this action under 28 U.S.C. §§ 1331, 1337, and 1345, and 21 U.S.C. § 332(a).

4.      Venue in this district is proper under 28 U.S.C. § 1391(b) and (c).

**Defendants and Their Operations**

5.      Edge Pharma is a limited liability company formed under the laws of the state of Delaware. Edge Pharma's principal places of business are located at 856 Hercules Drive and 948 Hercules Drive, Colchester, Vermont 05446, and 450 Weaver Street, Suite 3, Winooski, Vermont 05404, within the jurisdiction of this Court. Edge Pharma holds an active pharmacy license in the state of Vermont and has approximately 110 employees.

6.      William Marc Chatoff is Edge Pharma's founder, majority owner, chief executive officer, and managing director. Defendant William Marc Chatoff is the person most responsible for Edge Pharma's operations and has ultimate authority over the company's growth and

development, resource allocation, and personnel decisions. Defendant Chatoff performs his duties at Edge Pharma, within the jurisdiction of this Court.

7.    Kurt Radke is Edge Pharma's director of quality and is responsible for administering and monitoring the company's quality management system. Defendant Kurt Radke has held this role since October 2020 and has the authority to detect, correct, and prevent violations of the Act. Defendant Radke performs his duties at Edge Pharma, within the jurisdiction of this Court.

8.    During their regular course of business, Defendants manufacture, process, pack, label, hold, and distribute articles of drug, within the meaning of 21 U.S.C. § 321(g)(1). Defendants' sterile drugs include injectables for intravenous, intramuscular, and intraocular administration and topical ophthalmic solutions; their non-sterile drugs include products for oral, topical, or intranasal administration. Among Defendants' sterile drugs are antibiotics, surgery drugs, and nerve blocks, such as: Vancomycin Hydrochloride ("HCl") Preservative Free ("PF"), an antibiotic administered by intravenous injection; Phenylephrine HCl, an intravenous injection to treat low blood pressure that may occur during surgery; and Buffered Lidocaine HCl/Epinephrine Solution PF, an injectable nerve-block agent. Under the Act, sterile drugs are drugs that are required to be sterile under federal or state law or drugs that, by nature of their intended use or method of administration, are expected to be sterile. *See* 21 U.S.C. § 353b(d)(5).

9.    Defendants' sterile drugs are aseptically processed, which involves either (a) using non-sterile ingredients to produce drug products that are then sterilized, e.g., by filtration, and filled into their final containers in a manner that maintains sterility, or (b) using sterile components to produce drug products and ensuring that sterility is maintained throughout the production process.

3

10.     Defendants' facility contains "cleanrooms" for production of drugs intended to be sterile. These cleanrooms include "ISO 5," "ISO 7," and "ISO 8" processing areas (referring to International Standards Organization classifications for cleanrooms).  ISO 5 processing areas are critical zones that, by designation, have the highest level of cleanliness within the facility. Defendants, however, lack sufficient control in their ISO 5 areas to prevent contamination during aseptic processing.  Drugs intended to be sterile that are manufactured under such conditions present a significant risk to patient safety.

11.     Defendants distribute their drug products to hospitals, outpatient surgery centers, and medical offices throughout the United States, including to Arizona, Indiana, Oklahoma, and North Dakota.

12.     Defendants manufacture their drug products using components that were shipped in interstate commerce, including components from Massachusetts and North Carolina.

**The Act's Requirements**

13.     Under the Act, a "drug" includes any article that is "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease" or that is "intended to affect the structure or any function of the body."  21 U.S.C. §§ 321(g)(1)(B), (g)(1)(C).

14.     A drug is deemed to be adulterated "if it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health."  21 U.S.C. § 351(a)(2)(A).

15.     The Act requires drugs to be manufactured in accordance with current good manufacturing practice ("CGMP").  21 U.S.C. § 351(a)(2)(B); 21 C.F.R. § 210.1(b).  A drug is deemed to be adulterated if the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or

4

administered in conformity with CGMP to assure that it meets the requirements of the Act as to

safety and that it has the identity and strength, and meets the quality and purity characteristics,

which it purports or is represented to possess, regardless of whether the drug is actually defective

in some way. FDA has promulgated CGMP regulations for drugs at 21 C.F.R. Parts 210, 211.

16.    A drug is deemed to be misbranded "unless its labeling bears adequate directions

for use." 21 U.S.C. § 352(f)(1).

17.    The Act prohibits interstate distribution of a "new drug" unless the drug has been

approved by FDA or qualifies for an exemption from that requirement. *See* 21 U.S.C. §§ 331(d),

355(a). A "new drug" includes any drug "the composition of which is such that such drug is not

generally recognized, among experts qualified by scientific training and experience to evaluate

the safety and effectiveness of drugs, as safe and effective for use under the conditions

prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. § 321(p)(1).

### The Act's Exemptions for Compounded Drugs

18.    Edge Pharma is registered with FDA under 21 U.S.C. § 353b as an outsourcing

facility. Edge Pharma submitted its most recent annual registration on November 3, 2021.

19.    An "outsourcing facility" is a facility that engages in the compounding of sterile

drugs, registers as an outsourcing facility pursuant to 21 U.S.C. § 353b(b) and complies with all

of the requirements of 21 U.S.C. § 353b. *See* 21 U.S.C. § 353b(d)(4)(A).

20.    Compounding generally refers to the practice in which a licensed pharmacist or

physician (or, in the case of an outsourcing facility, a person under the direct supervision

licensed pharmacist) combines, mixes, or alters ingredients to create a drug. "Compounding" by

outsourcing facilities "includes the combining, admixing, mixing, diluting, pooling,

reconstituting, or otherwise altering of a drug or bulk drug substance to create a drug." 21

U.S.C. § 353b(d)(1). Compounded drugs generally are tailored to the needs of identified individual patients, although outsourcing facilities are not required to obtain prescriptions for identified individual patients. *See* 21 U.S.C. § 353b(d)(4)(C).

21.    Outsourcing facilities are required to manufacture, process, pack, and hold drugs in compliance with CGMP. *See* 21 U.S.C. § 353b(a).

22.    Drug products compounded in a registered outsourcing facility are exempt from the Act's adequate directions for use and premarket approval requirements only if they are compounded by the outsourcing facility in accordance with all the conditions in 21 U.S.C. § 353b. *See* 21 U.S.C. § 353b(a). To qualify for that exemption, among other things, the label of a drug compounded by an outsourcing facility must contain several specified statements and information, including the statement "This is a compounded drug." 21 U.S.C. § 353b(a)(10)(A)(i).

### FDA's September–November 2021 Inspection

23.    FDA conducted its most recent inspection at Edge Pharma between September 20 and November 30, 2021 ("2021 Inspection").

24.    During the 2021 Inspection, FDA investigators observed numerous insanitary conditions, as described in paragraphs 29-38 below, and CGMP violations, as described in paragraph 42 below.

25.    As discussed in paragraph 47 below, the 2021 Inspection also revealed that Defendants' product labels omit information required by 21 U.S.C. § 353b(a)(10)(A)(i).

26.    At the close of the 2021 Inspection, FDA investigators issued a Form FDA-483, List of Inspectional Observations ("FDA-483"), to Defendant William Marc Chatoff and discussed the FDA-483 observations with him.

6

### Adulteration Based on Insanitary Conditions

27.     The insanitary conditions documented during FDA's 2021 Inspection establish that drugs manufactured and distributed by Defendants are adulterated within the meaning of 21 U.S.C. § 351(a)(2)(A).

28.     Edge Pharma's own records reveal that Defendants repeatedly found mold species in the air and on surfaces in classified cleanroom suites used for processing drugs intended to be sterile, and in suites used for processing non-sterile drugs, demonstrating that drug products manufactured in those areas are prepared, packed, or held under insanitary conditions.

29.     On approximately 124 occasions between April 2020 and September 2021, Defendants detected mold, including *Aspergillus*, *Cladosporium*, and *Penicillium*, in their classified cleanroom suites.  On at least two of those occasions, mold was recovered from the critical ISO 5 areas where drugs intended to be sterile are directly exposed to the environment during processing and thus are most susceptible to contamination.  Mold was also found in samples taken from areas classified as ISO 7 that immediately surround the ISO 5 areas.  Among the mold species identified in Defendants' classified cleanroom suites is *Aspergillus fumigatus*, which can cause a wide spectrum of diseases in humans and may lead to death, particularly in immunocompromised patients.

30.     Defendants' airflow pattern studies ("smoke studies") demonstrate that Defendants fail to maintain proper airflow between their ISO 5 and ISO 7 areas, causing ISO 7 air to reflux into the ISO 5 areas and contributing to the risk of airborne mold in critical aseptic processing areas.

31.     Defendants' smoke studies also reveal that airflow inside their critical ISO 5 areas is turbulent, which can create channels or reservoirs for airborne contaminants, including mold

7

and bacteria. Defendants approved the smoke studies, despite having failed to show that proper airflow patterns are achieved in ISO 5 areas, and concluded that their aseptic processing suites are adequate for producing drugs intended to be sterile.

32.     Defendants' smoke studies also indicate that their facility has inadequate air pressure differentials inside ISO 7 areas, which further increases the risk of contamination in Defendants' drugs. Specifically, Defendants do not adequately prevent ISO 7 air in the gowning area from entering the ISO 7 production area that surrounds critical ISO 5 areas. Skin is exposed during gowning, and skin is an abundant source of particles and microorganisms. A positive pressure differential must be maintained between the ISO 7 gowning area and the ISO 7 production area so that airborne contaminants from skin do not enter the production area that surrounds critical ISO 5 areas. Defendants neither reliably monitor the air pressure differential between the ISO 7 areas nor ensure that air of lesser quality does not move from the ISO 7 gowning area into the ISO 7 production area. Because Defendants also lack proper air flow between ISO 7 areas and critical ISO 5 areas, as described above, refluxing air from the ISO 7 production area, which may contain particles and microorganisms from the gowning area, can introduce airborne contaminants into ISO 5 aseptic processing areas.

33.     Defendants distributed their drugs intended to be sterile even when the products failed finished product testing for sterility or endotoxins. According to Defendants' records:

        a.      Between April 2021 and September 2021, approximately 17.5% (60 out of 342) of drug product lots failed sterility testing based on the presence of particles that may indicate microbial contamination. Despite the failed sterility results, Defendants' Quality Unit concluded that each drug product lot met sterility specifications and approved the drugs for

8

distribution. Defendants used these lots to fill approximately 1,806 orders from healthcare professionals for patient treatments; and

        b.     Between June 2020 and September 2021, Defendants distributed 12 lots of drugs intended to be sterile that failed initial testing for endotoxins. Endotoxins are toxins found in the outer membrane of some bacteria and are released when the bacterial cells disintegrate; in humans, endotoxins may cause high fever, hypotension, shock, and death. Defendants' Quality Unit invalidated the initial endotoxin data and, based on passing retest results, used the lots to fill approximately 333 orders from healthcare professionals for patient treatments. However, Defendants have not provided assurance that these drug product lots met specifications regarding endotoxins. Defendants' standard operating procedures for endotoxin testing and investigating out-of-specification results call for an investigation of a failing endotoxin test and require the identification of a laboratory error before approving a re-test, but Defendants' investigations did not demonstrate that a laboratory error was conclusively determined before allowing re-tests after initial endotoxin failures. Endotoxin molecules form aggregates and typically are not uniformly distributed throughout a product lot; therefore, a retest may erroneously pass a contaminated product. Absent a definitive determination that endotoxin failures were caused by laboratory error, the routine practice of retesting and accepting passing retest results is inappropriate and can endanger patient health.

        34.     During the 2021 Inspection, FDA investigators observed additional insanitary conditions at Defendants' facility, including a live mosquito in an area immediately adjacent to a cleanroom suite. Based on Defendant's pest control records, numerous insects were found near cleanroom suites between August and September 2021. Insects pose a health risk to patients because they are a source of microbial and particulate contamination in classified drug

processing areas. FDA investigators also documented that, when a live ant was found crawling on a purportedly sterile gowning of a technician inside an ISO 7 area, Defendants' Quality Unit did not adequately assess the impact on drugs intended to be sterile that had been processed in the classified areas at that time. Instead of conducting a thorough evaluation, Defendants' Quality Unit cleared the drugs for further processing.

35.    During the 2021 Inspection, FDA investigators also observed Defendants' facility in a state of disrepair that can affect drug quality and purity, which reveals that Defendants' Quality Unit is not monitoring the facility to ensure sanitation controls are established and implemented. For example, FDA investigators observed: rust inside ISO 5-classified biological safety cabinets used for producing hazardous drugs (e.g., chemotherapy agents) intended to be sterile; rust on the exterior of ISO 5-classified biological safety cabinets; rust on carts in an ISO 7 area; deposits of blackish grime on floors outside cleanroom suite doors; greenish fuzzy material on the unclassified side of a double-sided refrigerator leading into an ISO 7 area; white crusty residue on an air duct return above a cleanroom suite; damaged baseboards in a drug component staging area that expose unfinished drywall, which is not easily cleaned or sanitized; cracks underneath passthroughs connecting unclassified areas to ISO 7 areas, which can provide an entry for insects into cleanroom suites; and black mold-like substance on a wall in the warehouse that stores components used to manufacture Defendants' products.

36.    The *Aspergillus*, *Cladosporium*, and *Penicillium* molds that Defendants detected in their classified cleanroom suites are associated with water-damaged building material. The ongoing presence of these molds indicates that (a) Defendants have not resolved the water damage caused by a roof leak around February 2020 or the condensation issues in the heating,

10

ventilation, and air conditioning ("HVAC") ductwork in June 2020, and/or (b) there are other undetermined issues that continue to promote mold growth in Defendants' drug processing areas.

37.     The 2021 Inspection documented other evidence of insanitary conditions, including:

a.     Detection of particles in approximately 31% (62 of 200) of Defendants' media fills that were run between April 2020 and September 2021. Media fill runs are process simulations that are conducted to demonstrate the effectiveness of aseptic processes, to ensure that products will be adequately protected against contamination during actual sterile drug production. Particles in media fills may be an indicator of microbial contamination and need to be investigated by a quality control unit to ensure that drug products intended to be sterile are in fact sterile and do not pose a health risk to patients. However, Defendants did not investigate and determine the root cause of the particles but, instead, approved the media fill study as successful. Defendants continued to manufacture drugs intended to be sterile without assurance that their aseptic processes are capable of maintaining product sterility;

b.     Failure to conduct media fills in each ISO 5 area used to produce drugs intended to be sterile and, for media fills conducted in other classified areas, failure to include common processing interventions, such as re-filtering of drug product solutions, to demonstrate that those interventions do not compromise the aseptic nature of the process; and

c.     Failure to conduct smoke studies with common processing interventions, such as transferring materials in and out of ISO 5 areas used to prepare hazardous drug products intended to be sterile. Smoke studies must be conducted under operational ("dynamic") conditions to assess the airflow patterns necessary to maintain a unidirectional flow of sufficient velocity from areas of higher air quality (e.g., ISO 5) to areas of lower air quality (e.g., ISO 7) to

11

prevent microbial contamination of sterile drug products during processing. Without adequate smoke studies, there is no assurance that the air quality in the aseptic processing areas is tightly controlled and continuously maintained, which, in turn, puts drug products being processed in those areas at risk of contamination.

38.    Defendants violate 21 U.S.C. § 331(a) by introducing or causing to be introduced, or delivering or causing to be delivered for introduction, into interstate commerce articles of drug that are adulterated within the meaning of 21 U.S.C. § 351(a)(2)(A) in that they are prepared, packed, or held under insanitary conditions whereby they may have been contaminated with filth or whereby they may have been rendered injurious to health.

39.    Defendants violate 21 U.S.C. § 331(k) by causing articles of drug to become adulterated within the meaning of 21 U.S.C. § 351(a)(2)(A) while such drugs are held for sale after shipment of one or more of their components in interstate commerce.

**Adulteration Based on CGMP Violations**

40.    The CMGP deficiencies documented during FDA's 2021 Inspection at Defendants' facility establish that drugs manufactured and distributed by Defendants are adulterated within the meaning of 21 U.S.C. § 351(a)(2)(B).

41.    During the 2021 Inspection, FDA investigators observed deviations from CGMP requirements including, but not limited to:

a.    Failure to employ an adequate quality control unit to fulfill its responsibilities including, but not limited to, ensuring that each batch of drug product meets specifications before release for distribution (*see* 21 C.F.R. § 211.22(a)). The actions of Defendants' Quality Unit are grossly inadequate and include, among numerous other examples,

approving for distribution drugs intended to be sterile, notwithstanding failed sterility and/or

endotoxin tests, as described in paragraph 34 above;

        b.      Failure to establish an adequate system for cleaning and disinfecting

rooms and equipment to produce aseptic conditions (*see* 21 C.F.R. § 211.42(c)(10)(v)).  For

example, Defendants do not adhere to the established contact time for their sporicidal agent

when cleaning classified cleanroom areas, and they store opened sterile wipes in an ISO 7 area

adjacent to and in contact with nonsterile items;

        c.      Failure to maintain buildings used in the manufacture, processing,

packing, and/or holding of drugs in a clean and sanitary condition, free of vermin, and in good

repair (*see* 21 C.F.R. §§ 211.56 and 211.58), as described in paragraphs 35-36 above;

        d.      Failure to establish and implement appropriate written procedures

designed to prevent microbial contamination of drug products intended to be sterile (*see* 21

C.F.R. § 211.113(b)), as described in paragraphs 30-34 and 38 above;

        e.      Failure to thoroughly review and investigate any unexplained discrepancy

or the failure of a batch or any of its components to meet any of its specifications, whether or not

the batch has been distributed (*see* 21 C.F.R. § 211.192).  Defendants' Quality Unit performed

superficial investigations that resulted in release of drug product lots with unreliable quality,

purity, and/or strength.  For example:

        *i.*      During personnel monitoring on August 28, 2020, a high level of

*Microbacterium liquifaciens* was detected on the gloved finger of a technician who processed

approximately half a lot of Phenylephrine Hydrochloride 0.1 milligrams (mg) per milliliter (mL)

Injectable Solution.  The same bacterium was detected on the surface of a table inside an ISO 5

area, where another drug product was prepared;

    *ii.*  Shortly thereafter, during personnel monitoring on September 4,

2020, a high level of *Microbacterium liquifaciens* was again detected on the sleeve of a

technician who processed approximately half a lot of Succinylcholine Chloride (PF) 20 mg/mL

Injectable Solution. The same bacterium was detected on the surface of a table in an ISO 7 area

surrounding an ISO 5 area.

  On both occasions, Defendants' Quality Unit decided that the most probable root cause of

the bacterial contamination was improper sanitization of materials, but did not investigate why

the materials were so highly contaminated. Although the Quality Unit rejected the portions of

the lots processed by the technicians with identified microbial contamination, it released the

remaining portions of the lots for patient use without evaluating whether the technicians had

spread contamination to areas associated with the remaining portions of the lots or other drug

products prepared in adjacent areas during the same time frame. Without a proper evaluation of

these issues, Defendants could not have assurance of product sterility, which creates a risk to

patient safety;

    f.  Failure to ensure that laboratory records include complete data derived

from all tests necessary to ensure compliance with established specifications and standards (*see*

21 C.F.R. § 211.194(a)). For example, FDA investigators found original records in Defendants'

shred bin, including environmental monitoring results dated August 30, 2021, and September 1,

2021, documenting airborne mold contamination, respectively, inside a passthrough connecting a

cleanroom suite to unclassified areas and inside an ISO 7 area. Destroying original records

related to drug processing is an unacceptable practice because it can lead to the inadvertent loss

of information needed to ensure that drug products meet all their specifications; and

14

g.    Failure to establish and follow adequate written procedures describing the handling of all written and oral complaints regarding a drug product, including provisions for review by a quality control unit of any complaint involving the possible failure of a drug product to meet any of its specifications and, for such drug products, a determination as to the need for an investigation in accordance with 21 C.F.R. § 211.192 (*see* 21 C.F.R. § 211.198(a)).  For example, between July 2020 and September 2021, Defendants received several reports involving adverse events, such as patients experiencing painful burning or a lack of effectiveness (numbing effect), related to injectable Lidocaine preparations but, despite these reports, the Quality Unit did not complete thorough investigations to determine whether product quality had been compromised and contributed to the adverse events.  Defendants also continued to receive complaints about leaking container closure systems (e.g., products leaking from a syringe or vial) but the Quality Unit has not conducted an adequate investigation into whether the container closure systems are suitable for maintaining sterility assurance of drugs intended to be sterile.

42.    Defendants violate 21 U.S.C. § 331(a) by introducing or causing to be introduced, or delivering or causing to be delivered for introduction, into interstate commerce articles of drug that are adulterated within the meaning of 21 U.S.C. § 351(a)(2)(B) in that the methods used in, or the facilities or controls used for, their manufacturing, processing, packing, and holding do not comply with CGMP to assure that they meet the requirements of the Act as to their safety and that they have the identity and strength, and meet the quality and purity characteristics, which they purport or are represented to possess.

43.    Defendants violate 21 U.S.C. § 331(k) by causing articles of drug to become adulterated within the meaning of 21 U.S.C. § 351(a)(2)(B) while such drugs are held for sale after shipment of one or more of their components in interstate commerce.

**Unapproved New Drugs**

44.     Several of Defendants' drug products, including, but not limited to, Let Topical Gel, Lidocaine HCl 1%, Metacholine Chloride 1mg/mL, Lidocaine/Epinephrine 1%/1:100,000, Lidocaine/Epinephrine 3%/1:400,000, and Phenylephrine 1mg/10mL, are new drugs within the meaning of 21 U.S.C. § 321(p).

45.     New drugs manufactured at an outsourcing facility in compliance with 21 U.S.C. § 353b are exempt from the new drug approval requirements under 21 U.S.C. § 355 only if Defendants comply with all the conditions of 21 U.S.C. § 353b for each drug product. *See* 21 U.S.C. § 353b(a).

46.     At the time of the 2021 Inspection, the labels for Defendants' Let Topical Gel, Lidocaine HCl 1%, Metacholine Chloride 1mg/mL, Lidocaine/Epinephrine 1%/1:100,000, Lidocaine/Epinephrine 3%/1:400,000, and Phenylephrine 1mg/10mL were missing the statement "This is a compounded drug," which is information required by 21 U.S.C. § 353b(a)(10)(A)(i). Thus, these drugs are not exempt from the Act's drug approval requirements.

47.     Defendants' Let Topical Gel, Lidocaine HCl 1%, Metacholine Chloride 1mg/mL, Lidocaine/Epinephrine 1%/1:100,000, Lidocaine/Epinephrine 3%/1:400,000, and Phenylephrine 1mg/10mL lack an approved drug application, as required by 21 U.S.C. § 355, and are not otherwise exempt from approval pursuant to an investigational new drug application under 21 U.S.C. § 355(i). Hence, these drugs are unapproved new drugs.

48.     Defendants violate 21 U.S.C. § 331(d) by introducing or causing to be introduced, or delivering or causing to be delivered for introduction, into interstate commerce unapproved new drugs.

## Misbranding Based on Lack of Adequate Directions for Use

49.    Due to their toxicity or other potentiality for harmful effect, or the method of their use, or the collateral measures necessary to their use, Defendants' drugs are not safe for use except under the supervision of a practitioner licensed by law to administer such drugs.  As such, Defendants' drugs are "prescription drugs" within the meaning of 21 U.S.C. § 353(b)(1)(A).

50.    "Adequate directions for use" means directions under which a layperson could use a drug safely and effectively for the purposes for which the drug is intended.  21 C.F.R. § 201.5.  A prescription drug, by definition, cannot bear adequate directions for use by a layperson because such drug must be administered under the supervision of a licensed practitioner.  *See* 21 U.S.C. § 353(b)(1).  By regulation, FDA has established exemptions for certain drugs from the requirement that their labeling includes adequate directions for use, but Defendants' drug products do not satisfy the conditions for any of these exemptions.  *See* 21 C.F.R. Part 201 Subpart D—Exemptions from Adequate Directions for Use.

51.    As noted in paragraph 47 above, at the time of the 2021 Inspection, the labels for Defendants' Let Topical Gel, Lidocaine HCl 1%, Metacholine Chloride 1mg/mL, Lidocaine/Epinephrine 1%/1:100,000, Lidocaine/Epinephrine 3%/1:400,000, and Phenylephrine 1mg/10mL were missing information required by 21 U.S.C. § 353b(a)(10)(A)(i).  Thus, these drugs do not qualify for the exemption in 21 U.S.C. § 353b from the adequate directions for use requirement in 21 U.S.C. § 352(f)(1).  *See* 21 U.S.C. § 353b(a).

52.    As prescription drugs, Defendants' Let Topical Gel, Lidocaine HCl 1%, Metacholine Chloride 1mg/mL, Lidocaine/Epinephrine 1%/1:100,000, Lidocaine/Epinephrine 3%/1:400,000, and Phenylephrine 1mg/10mL lack adequate directions for use as a matter of law.

Because these drugs are not exempt from the requirement for adequate directions for use, they are misbranded within the meaning of 21 U.S.C. § 352(f)(1).

53.     Defendants violate 21 U.S.C. § 331(a) by introducing or causing to be introduced, or delivering or causing to be delivered for introduction, into interstate commerce articles of drug that are misbranded within the meaning of 21 U.S.C. § 352(f)(1) in that the labeling of the drugs fail to bear adequate directions for use, and the drugs are not exempt from the requirements of 21 U.S.C. § 352(f)(1).

54.     Defendants violate 21 U.S.C. § 331(k) by causing articles of drug that are not exempt from the requirements of 21 U.S.C. § 352(f)(1) to become misbranded within the meaning of 21 U.S.C. § 352(f)(1) while such drugs are held for sale after shipment of one or more of their components in interstate commerce.

### Prior Inspections and Warnings to Defendants

55.     As revealed by FDA's inspections, Defendants have an extensive history of violating the Act and failing to take appropriate corrective actions to remedy their violations.

56.     In March 2020, FDA inspected Edge Pharma ("2020 Inspection") and observed insanitary conditions and CGMP deficiencies similar to those observed during the 2021 Inspection including, but not limited to:

        a.     Mold contamination in classified cleanroom suites;

        b.     An ant on a purportedly sterile hood of a technician in an ISO 7 area, and the subsequent failure of Defendants' Quality Unit to adequately assess the impact on sterility assurance for drug products produced in the classified area at that time;

        c.     A state of disrepair, such as gaps between the doors and floor in classified cleanrooms, chipped paint on metal tracking used to secure ceiling tiles in an ISO 7 production

area, and water-stained ceiling tiles in various rooms including the main production room where materials are staged for processing;

        d.     Lack of an adequate system for cleaning and disinfecting rooms and equipment to produce aseptic conditions, for example, failing to adhere to established contact times for disinfecting agents used to clean classified cleanroom areas;

        e.     Failure to maintain buildings used in the manufacture, processing, packing, and/or holding of drugs in a clean and sanitary condition and free of vermin;

        f.     Failure to establish and implement appropriate written procedures designed to prevent microbial contamination of drug products intended to be sterile including, but not limited to, a lack of adequate smoke studies;

        g.     Failure to thoroughly review and investigate unexplained discrepancies or the failure of a batch or its components to meet any of its specifications, for example, failing to investigate the cause of subvisible particles in an intraocular injection drug that was recalled on the basis of those particles;

        h.     Failure to ensure that laboratory records include complete data derived from all tests necessary to ensure compliance with established specifications including, but not limited to, discarding a completed and signed sterility testing form in a shred bin; and

        i.     Failure to investigate customer complaints about leaking or broken container closure systems.

     57.     During the 2020 Inspection, an FDA investigator also observed that Defendants' drugs had labels that omitted information required by 21 U.S.C. § 353b(a)(10)(A)(i), such as the statement "This is a compounded drug."

58.    At the close of the 2020 Inspection, FDA investigators issued an FDA-483 to Defendant William Marc Chatoff and discussed the inspectional observations with him.

59.    During a prior inspection at Edge Pharma between February and March 2018, FDA investigators documented insanitary conditions and CGMP deficiencies including, but not limited to, distribution of nonconforming product, media fill inadequacies, smoke study deficiencies, inadequate air pressure differentials, cleaning and sanitization deficiencies, data integrity lapses, and inadequate investigations. These observations are the same or similar to deviations observed during subsequent FDA inspections in 2020 and 2021.

60.    FDA held a regulatory meeting with Defendant William Marc Chatoff on October 16, 2017, to discuss the deficiencies observed during an FDA inspection in January 2017. During the meeting, FDA staff addressed issues including, but not limited to, cleaning and disinfection operations, facility design, airflow patterns, smoke studies, and controlling the risk of product contamination.

61.    FDA issued a Warning Letter dated November 12, 2015, to Defendant William Marc Chatoff, notifying him that, during a July 2014 inspection, an FDA investigator observed serious deficiencies in Edge Pharma's practices for manufacturing drugs intended to be sterile. The Warning Letter informed Defendant Chatoff that Edge Pharma's drug products are (a) adulterated because they are manufactured under insanitary conditions and in violation of CGMP, (b) unapproved new drugs, and (c) misbranded drugs because their labeling lacks adequate directions for use. The Warning Letter noted that the failure to take prompt action to correct deficiencies could result in legal action without further notice, including injunction.

62.    Despite ample warning from FDA and numerous submissions by Defendant William Marc Chatoff regarding promised corrective action, the conditions and practices at Edge

20

Pharma have persisted and even deteriorated, as evidenced by the observations made by FDA investigators during the 2021 Inspection.

63.    Immediately following the 2021 Inspection, FDA held a teleconference with Edge Pharma management, including Defendant William Marc Chatoff, to request that the company voluntarily recall all drugs within expiry, and cease production and distribution of all drug products, because of concerns that Defendants' drugs may present a risk to patient safety. Although Defendant Chatoff agreed to FDA's requests, in a subsequent December 21, 2021 letter to FDA, he disputed the significance of the insanitary conditions and CGMP deficiencies observed during the 2021 Inspection, including the mold recoveries, bacterial recoveries, inadequate airflow patterns, inadequate air pressure differentials, the presence of pests, product sterility and endotoxin failures, and inadequate investigations by the Quality Unit. In his December 21, 2021 letter, Defendant Chatoff also informed FDA that Edge Pharma intended to resume operations in late February or early March 2022.

64.    In a January 15, 2022 reply to Defendant Chatoff's December 2021 response, FDA noted its ongoing concerns that Edge Pharma's drugs will be produced under insanitary conditions, in violation of CGMP, and without assurance that drugs intended to be sterile are in fact sterile. FDA also explained that Defendants' proposed corrective actions are inadequate and gave several examples of deficiencies. Further, FDA urged Defendants to refrain from producing drug products until (a) the violations have been addressed, (b) corrective actions have been verified by FDA, and (c) FDA has agreed that compounding operations at Edge Pharma may resume.

65.    On February 7, 2022, Defendant William Marc Chatoff committed to waiting for FDA concurrence before resuming compounding operations at Edge Pharma. However, based

on Defendants' history of failing to heed FDA's warnings to resolve deficiencies, particularly

Defendants' failure to establish and follow procedures to prevent microbial contamination of

sterile drug products, there is no assurance that Defendants are able, on a voluntary basis, to take

the necessary and sufficient steps to achieve compliance.

66.    Accordingly, the United States believes that, unless restrained by the Court,

Defendants will continue to violate 21 U.S.C. §§ 331(a), (k), and (d), in the manner alleged

herein.

WHEREFORE, the United States respectfully requests that this Court:

I.    Permanently restrain and enjoin Defendants and each and all of their directors,

officers, agents, representatives, employees, attorneys, successors, and assigns, and any and all

persons in active concert or participation with any of them, from manufacturing, processing,

packing, labeling, holding, or distributing any article of drug unless and until Defendants bring

their manufacturing, processing, packing, labeling, holding, and distribution operations into

compliance with the Act and its implementing regulations to the satisfaction of FDA;

II.    Permanently restrain and enjoin under 21 U.S.C. § 332(a) Defendants and each

and all of their directors, officers, agents, representatives, employees, attorneys, successors, and

assigns, and any and all persons in active concert or participation with any of them, from directly

or indirectly doing or causing the following acts:

A.    Violating 21 U.S.C. § 331(a) by introducing or causing to be introduced,

or delivering or causing to be delivered for introduction, into interstate commerce any drug that

is adulterated within the meaning of 21 U.S.C. §§ 351(a)(2)(A) or 351(a)(2)(B), or misbranded

within the meaning of 21 U.S.C. § 352(f)(1);

B.      Violating 21 U.S.C. § 331(k) by causing any drug to become adulterated within the meaning of 21 U.S.C. §§ 351(a)(2)(A) or 351(a)(2)(B), or misbranded within the meaning of 21 U.S.C. § 352(f)(1), while such drug is held for sale after shipment of one or more of its components in interstate commerce; and

C.      Violating 21 U.S.C. § 331(d) by introducing or causing to be introduced, or delivering or causing to be delivered for introduction, into interstate commerce any new drug that is neither approved under 21 U.S.C. § 355 nor exempt from approval;

III.      Authorize FDA pursuant to this injunction to inspect Defendants' places of business and all records relating to the receipt, manufacture, processing, packing, labeling, holding, and distribution of any drug to ensure continuing compliance with the terms of the injunction, with the costs of such inspections, including testing and sampling, to be borne by Defendants at the rates prevailing at the time the inspections are accomplished; and

IV.     Award the United States costs and other such relief as the Court deems just and

proper.


DATED this 20th day of May 2022.

                                    Respectfully submitted,


                                    NIKOLAS KEREST
                                    United States Attorney

                                    ARUN G. RAO
OF COUNSEL:                         Deputy Assistant Attorney General
                                    Civil Division
DANIEL J. BARRY
Acting General Counsel              GUSTAV W. EYLER
Department of Health and Human Services   Director
                                    Consumer Protection Branch
MARK RAZA
Chief Counsel                       JOHN W. M. CLAUD
Food and Drug Administration        Assistant Director

PERHAM GORJI
Deputy Chief Counsel for Litigation   By: _David G. Crockett Jr. / DJC_
                                    DAVID G. CROCKETT JR.
CLAUDIA J. ZUCKERMAN                Trial Attorney
Senior Counsel                      Consumer Protection Branch, Civil Division
Office of the Chief Counsel         Department of Justice
Food and Drug Administration        P.O. Box 386
10903 New Hampshire Avenue          Washington, D.C. 20044
Bldg. 31, Rm 4550                   202-305-0192
Silver Spring, MD 20993-0002        david.g.crockett@usdoj.gov